■    In the Matter of Howard M. Iserson, Petitioner, v. Board of Regents of the University of the State of New York, Respondent.— Proceeding pursuant to article 78 of the Civil Practice Act to review a determination of the respondent, Board of Regents of the University of the State of New York. Petitioner's license to practice medicine has been revoked by the Board of Regents which sustained and adopted findings of its Medical Grievance Committee. The essential portions of those findings are that the "respondent had issued false and fraudulent medical bills and reports for patients referred to him by the attorney I. Frank Miller and had permitted the said attorney to use his stationery for the issuance of additional false and fraudulent medical bills and reports, all in furtherance of an understanding and agreement between them to that end and that the respondent was paid therefor"; and that "respondent knew that these false and fraudulent medical bills and reports would be used by the attorney for the purpose of enhancing the claims of said attorney's clients for compensation arising out of injuries for which respondent allegedly had rendered treatment, and that these false and fraudulent bills and reports would be submitted to insurance companies for that purpose." We are of opinion that these findings are supported by substantial evidence. In the case of one Leonard, two entirely disparate bills and medical reports were issued on petitioner's stationery, one report being in petitioner's handwriting and the other over his signature. Although each refers to a different date of accident, the periods of injury and diagnosis overlap. For an accident given as February 4, 1954, petitioner wrote a statement of diagnosis on April 30, 1954, describing contusions of the right arm and right shoulder, a rupture of the acromioclavicular ligaments of the shoulder with acromioclavicular separation, and he signed a bill dated May 31, 1954 for $162. But he also signed a report dated February 27, 1954 (i.e., between the date of the February 4, 1954 accident and the

handwritten statement of diagnosis of April 30, 1954) in which he referred to Leonard as having an accident on January 30, 1954 showing entirely different injuries, e.g., "Cerebral concussion manifested by severe headaches, nausea, and dizziness"; "Laceration, one-half inches long, above left eyelid", and six other specific items; and on June 25, 1954 he signed a bill for $201 for these injuries. There is adequate proof, in part by concession of counsel, that these documents were used and filed by the lawyer for the purpose of obtaining settlements with two separate insurance companies. It is clear from a statement filed by the patient that he was involved in only one accident and that his injury was that "I think I twisted my back and bruised one of my legs." Thus, while it may well be that the statement of diagnosis of April 30, 1954 is accurate, it is perfectly clear that the statement of diagnosis of February 27, 1954 is not only inaccurate but seems, and could well be found to be, an entirely false statement of injury based on a nonexistent accident. Indeed, the accuracy of this statement is not argued by petitioner in this court and the point is made in his brief that "He, again, unfortunately relied on the lawyer. There is nothing in the record to indicate that there were two accidents involving Arthur Leonard, or that the Doctor knew that there were claims for two accidents." The petitioner's explanation of this was that the lawyer came to him with "Mr. Leonard's thing", and said "'I've typed it up for you. Just sign it and sign the bill' and I didn't even look at it; I just signed it." The statement of the patient Leonard in an affidavit annexed to the petition is that the lawyer had told him that he, the lawyer, had "misplaced the report" and that he and the lawyer went to petitioner's office and asked for another report; that petitioner gave the lawyer two "pieces of stationery;" and that at a later date the lawyer told petitioner "this is the exact copy of the handwritten report. The doctor being busy did not read the report". The Regents did not have to accept this sort of explanation of the course of medical practice and in the context of proof of other activities of the petitioner in connection with the lawyer, could well have found a willfully fraudulent and false diagnosis over petitioner's signature. This additional contextual proof is that there were a number of sheets of petitioner's stationery used by the same lawyer in the prosecution of fraudulent claims which did not contain petitioner's signature and for persons whom petitioner concedes he did not treat. It is possible, as petitioner suggests in this proceeding, that the lawyer had printed or reproduced the stationery; but the Regents were entitled to consider the fact that petitioner conceded he sometimes gave the lawyer stationery to type his diagnoses in particular cases. In some cases petitioner's signature was shown to be forged to false bills and false reports appearing on his stationery; but petitioner admitted that in one instance (Fishman) he had personally received from the lawyer a photostatic copy of a report on his stationery containing his forged signature and that he placed it in his file without comment and, indeed, without noticing the forgery. He testified: "I didn't at the time take too much cognizance of the signature." This patient was not called as a witness; but the Regents could well have considered to be material and significant the failure of petitioner to act upon a forgery of his signature, although he read the "listing of injuries" over the signature, as indicating a course of conduct which made it possible with petitioner's sanction, for the lawyer to forge the petitioner's signature on other reports, concededly false. This procedure did not have to be, merely, as petitioner's brief argues "extremely careless". It is undisputed, too, that petitioner added charges for X rays to many of his own bills although he had no X-ray equipment and the Regents were not obliged to accept his explanation of this practice as being based on what the patient told him another doctor had charged for X rays. The record in

our view is sufficient to sustain the determination. Determination unanimously confirmed, without costs. Present — Bergan, P. J., Gibson, Herlihy and Reynolds, JJ.